UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

CARL ANTHONY DYE,                      )
                                       )
            Plaintiff,                 )
                                       )        No. 1:12-cv-125
v.                                     )
                                       )        *Collier / Lee*
COMMISSIONER OF SOCIAL SECURITY,       )
                                       )
            Defendant.                 )

## REPORT AND RECOMMENDATION

Plaintiff Carl Anthony Dye brought this action pursuant to 42 U.S.C. §§ 405(g) seeking

judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying him disability insurance benefits ("DIB") and supplemental security income

("SSI"). Plaintiff and Defendant have both moved for summary judgment [Docs. 14 & 15]. Plaintiff

alleges the Administrative Law Judge ("ALJ") erred when he did not include all of Plaintiff's

limitations in his physical or mental residual functional capacity ("RFC") findings and also erred

in concluding that Plaintiff's subjective complaints were not entirely credible. For the reasons stated

below, I **RECOMMEND** that (1) Plaintiff's motion for summary judgment [Doc. 14] be **DENIED**;

(2) the Commissioner's motion for summary judgment [Doc. 15] be **GRANTED**; and (3) the

decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS[1]

Plaintiff initially filed his application for DIB and SSI on November 12, 2008, alleging

disability as of August 1, 2008 (Transcript ("Tr.") 158-69). Plaintiff's claims were denied initially

---

[1] Plaintiff's prior application of January 26, 2001 was denied by an ALJ's decision on
February 19, 2002 (Tr. 66-74). It appears Plaintiff filed another application in September 2006,
which was denied at the initial stage (Tr. 78-79, 84-88, 146-57, 185-88).

and upon reconsideration and he requested a hearing before the ALJ (Tr. 80-83, 89-94, 97-105). The ALJ held a hearing on July 23, 2010, during which Plaintiff was represented by an attorney (Tr. 31-63). The ALJ issued his decision on August 13, 2010 and determined Plaintiff was not disabled because there were jobs in significant numbers in the economy which he could perform (Tr. 13-25). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 6-12). Plaintiff filed the instant action on April 16, 2012 [Doc. 1].

## II. FACTUAL BACKGROUND

### A. Education and Background

Plaintiff was 47 on the date of the hearing and the ALJ's decision and had completed the ninth grade in special education classes (Tr. 23, 48, 195). Plaintiff could not read well and had his sister-in-law fill out forms for him (Tr. 48). Plaintiff was able to handle money and make change, but had problems with reading and writing (Tr. 48-49). Plaintiff testified he was disabled due to pain in his back and legs and fatty tumors throughout his body (Tr. 35). Some of the fatty tumors were on the inner part of his thighs and on his arms and they constantly hurt (Tr. 36). Plaintiff later stated the tumors on his legs only hurt when walking, but the tumors on his arms stung and hurt all the time and more so when bumped; as a result, he would have problems picking up a box because anything rubbing against the tumors made them hurt (Tr. 37, 40, 56). Although an MRI of his thighs was negative, the doctors could see the tumors and were not sure if they were lymphomas, but recommended biopsies; however, Plaintiff had not had any tumors biopsied (Tr. 36-37, 41). Plaintiff stated he had had the tumors for about 15 years and had them while working, but they caused him problems during work and had increased in number and gotten worse over the last couple of years

2

(Tr. 41-42, 44). Plaintiff had a tumor in his stomach that would move from one side to the other over the course of about three days and would make him throw up when it moved (Tr. 55). The tumors finally got bad enough to prevent Plaintiff from working in 2008 (Tr. 45-46). They had altered Plaintiff's activities because he was embarrassed by the way he looked and the tumors made it difficult and painful to lift things (Tr. 56-57).

Plaintiff's back pain had also caused him problems while working because he could not walk much or carry trays, and the pain was so significant he could no longer perform his job to satisfaction (Tr. 42-43, 46-47). Plaintiff stated he had constant pain in his back, which caused him to have problems sitting for an extended period of time; after about 20 minutes sitting, he would have to stand back up due to pain (Tr. 38, 43). Plaintiff stated he could walk for about 50 feet and could stand for about 15 minutes before sitting down, but walking made the pain worse (Tr. 39, 43). Plaintiff could only lift about a two pound bag of sugar due to his back pain, but if he lifted more weight, the tumors would move around and make him sick to his stomach, which made him want to sleep (Tr. 47). Plaintiff took Darvocet for pain relief and did not think it was working as well as it had in the past (Tr. 36, 38). Plaintiff testified to lying down four times a day for about 30 minutes due to pain, but resting did not completely relieve the pain (Tr. 43). Plaintiff also stated he was on a waiting list to have an MRI of his spine to check for scoliosis because he had a bulging disc in his lumbar spine (Tr. 35-36).

Plaintiff stated that on a bad day, he would sit around and watch TV and would maybe try to sweep a floor to take his mind off things (Tr. 39). On a good day, he would watch wrestling if he was having a good time and it was on (Tr. 39). Plaintiff later testified that on good days, he could go outside on the porch; on bad days, he had to lie down for three to four hours (Tr. 44). Plaintiff

testified to having two bad days a week for the past year and a half (Tr. 44). Besides medicine and lying down, Plaintiff tried to take his mind off the pain by visiting his father in the nursing home (Tr. 53-54).

Plaintiff further testified to problems with anxiety, depression and panic attacks, which began after the death of his mother and stepdaughter, and which had not improved with treatment (Tr. 49). Plaintiff broke out in a sweat and turned white during panic attacks and attributed them to pain and losing his family members; he stated they occurred mostly while he was in the house, but also around crowds of people, even people he knew (Tr. 49-50). It usually took Plaintiff about an hour to calm down after taking Xanax, and he also took Depakote for mood swings (Tr. 50). Plaintiff also had depressed moods and was very angry and bored (Tr. 51). Plaintiff had problems handling stress and would get angry when he had to deal with any stress (Tr. 51-52). Plaintiff stated he had bad days every day when it came to mental health issues and the physical pain contributed to his depression (Tr. 53).

Plaintiff smoked about a pack of cigarettes a day (Tr. 52). Plaintiff testified he could not do his past work because it required too much walking and he could not perform such work due to pain; he also did not think he could work anywhere for five days a week due to pain in his legs, back and arms (Tr. 54).

### B.    Vocational Expert Testimony

During the hearing, the ALJ solicited the testimony of vocational expert Dr. Benjamin Johnston (the "VE") (Tr. 57). The ALJ first asked the VE to assume an individual of Plaintiff's age, education, and work experience, who could perform light work, but would need to alternate positions to be able to sit down for a minute or two every 30 minutes, could only perform simple,

4

repetitive and routine tasks, and could not work with the public (Tr. 57-58). The VE testified this individual could not perform Plaintiff's past work, but there would be other jobs available, such as an office cleaner, hand packer or inspector, all of which could be performed at times sitting and standing, and there were 250 to 300 of each of these jobs in the region and 75,000 nationally (Tr. 58). The VE testified that the Dictionary of Occupational Titles did not anticipate jobs with a sit/stand option, but experience indicated that it was how many jobs were performed (Tr. 58-59).

In response to questions by Plaintiff's counsel, the VE testified that if the individual could perform only sedentary work with the same restrictions, it would eliminate the office cleaner job, but not the other two (Tr. 59). The VE testified none of the jobs would permit a person to lie down for up to two hours during the workday (Tr. 59). The VE further testified that an individual could not be absent at all during the probationary period (generally the first six months) and could be absent about one day a month thereafter (Tr. 59). Therefore, an individual who missed one day a week would not be able to maintain employment (Tr. 60). The VE testified that if the individual could not hold things close to their body or have things touch their arms, it would eliminate work that the individual would otherwise be able to perform (Tr. 60).

The ALJ next asked the VE a second hypothetical question based on the question posed by Plaintiff's counsel about sedentary work and asked the VE to provide another example due to the elimination of the office cleaner position; the VE testified another example of a sedentary job that would accommodate the restrictions previously mentioned in the ALJ's first hypothetical would be a small parts assembler (Tr. 61-62). Like the other two examples, there were 250 to 300 of these jobs in the region and about 75,000 nationally (Tr. 62).

5

### C.    Medical Records

#### 1.    Physical

Plaintiff submitted to a physical examination by Dr. Emelito Pinga on November 21, 2006 (Tr. 291-96).  Plaintiff reported low back pains radiating to his hips and legs since 1979 that were not caused by any direct trauma and stated his primary care physician diagnosed him with pain secondary to degenerative arthritis of the lumbar spine in 2005 (Tr. 291).  Plaintiff had not had x-rays, MRIs, surgery, epidural steroid injection or physical therapy for his back problems and took Tylenol for pain (Tr. 291).  Plaintiff also reported the gradual appearance of non-inflamed and nontender nodules in his forearms starting in 1978 and stated a different primary care physician had diagnosed him with fatty tumors earlier in 2006 (Tr. 291).  Plaintiff had not had surgery, biopsy, or other examination of the nodules and claimed they were painful in cold weather (Tr. 291).  Plaintiff reported smoking two packs of cigarettes per day and reported last working in September 2006 (Tr. 291-92).

On examination, Dr. Pinga observed Plaintiff had no problems getting in and out of the chair and onto the examining table and had good manual dexterity; he did observe one half-inch sized nodule on each of Plaintiff's forearms and three one-inch nodules on Plaintiff's right thigh (Tr. 293-95).  Plaintiff had no impairments when walking (Tr. 295).  Dr. Pinga noted an impression of degenerative arthritis of the lumbar spine, on therapy with Tylenol, and multiple non-inflamed, nontender nodules most likely secondary to a lipoma or fatty tumor in the forearms and right thigh (Tr. 295).  Dr. Pinga recommended an MRI of Plaintiff's lumbar spine to rule out degenerative disc disease if the back pain persisted and surgery or a biopsy of his nodules (Tr. 295).  Dr. Pinga opined Plaintiff could sit for six hours in an eight hour workday, could walk or stand for four hours in an

eight hour workday, and could frequently lift five to 10 pounds and occasionally lift 15 pounds (Tr. 295).

On February 19, 2008, Plaintiff filled out a function report (Tr. 216-23). Plaintiff stated he spent days usually walking to see one of his sisters, who lived about a mile apart, and other times he would sit on the road in the woods thinking (Tr. 216, 220). Plaintiff indicated he had problems dressing himself about once a week because his arms would not let him, had problems combing his hair due to pain, sometimes needed to be reminded to bathe, cooked when he had something to eat, went outside for five to six hours a day because he could not stay in his family members' houses all the time, shopped occasionally, and could not lift anything over 50 pounds (Tr. 217-21). Plaintiff could walk half a mile before stopping to rest due to getting short of breath (Tr. 221).

In April and June 2008, Plaintiff reported to the emergency room with hearing and abdominal pain complaints and multiple fatty tumors were noted in his medical history (Tr. 297-306). Plaintiff began following at Southside Clinic in July 2008 and reported high cholesterol, back pain since the 1980s, insomnia, depression and tumors popping up on his arms, legs and left hip (Tr. 340). Seroquel and Lovastatin were prescribed (Tr. 340-41). Plaintiff did not return until November 2008, when he reported he could not afford Seroquel; tenderness was noted on his lumbar spine and subcutaneous soft and movable bumps were observed (Tr. 341). An x-ray was recommended for Plaintiff's lower back pain (Tr. 341). The x-rays, taken November 6, 2008, show a bilateral pars defect at L5 with minimal anterior slippage of L5 on S1 and mild degenerative spurring at L3 and L4 (Tr. 434).

On February 4, 2009, Plaintiff submitted to a physical examination by Dr. Thomas Mullady (Tr. 315-17). Plaintiff reported low back pain for the past 10 years and difficulty performing

previous jobs due to back pain; he also stated his legs went numb when he stood and he could not perform household chores for more than about 20 minutes due to pain and numbness (Tr. 315). Plaintiff reported being able to walk for about 20 minutes before the pain became severe and also had arthritic pain in his hands and knees (Tr. 315). Plaintiff had suffered from depression for years and had anxiety attacks and occasional suicidal thoughts (Tr. 315). Plaintiff further reported fatty lumps in his upper legs and arms and knots in his feet (Tr. 315). Dr. Mullady observed x-rays of Plaintiff's lumbar spine in November 2008 which showed a bilateral pars defect at the L5 level with minimal spondylolisthesis of L5/S1 (Tr. 315). Plaintiff reported smoking two to three packs of cigarettes a day (Tr. 316).

Upon examination, Dr. Mullady observed bilateral plantar calluses on Plaintiff's feet, but the range of motion in all joints, including lumbar spine and knees, was normal (Tr. 316). Plaintiff had normal muscle strength, normal grip strength, and a normal gait (Tr. 316). Dr. Mullady diagnosed Plaintiff with alleged low back pain and decreased visual acuity after observing Plaintiff's vision was impaired but he did not wear glasses (Tr. 316-17). Dr. Mullady opined Plaintiff could occasionally lift and/or carry a maximum of 20 pounds, could frequently lift and/or carry up to 10 pounds, could stand and/or walk for a total of at least two hours in an eight hour day and could sit for a total of about six hours in an eight hour day (Tr. 317).

Plaintiff returned to Southside Clinic in March 2009 and complained of low back pain radiating to both thighs; an MRI was recommended (Tr. 342). In May 2009, Plaintiff complained his tumors in both legs were getting worse and bigger and making it painful to walk; his Prozac was not working and he was very anxious (Tr. 343). It was observed that Plaintiff's tumors were soft, movable and painful to touch and an MRI of the upper thighs was recommended (Tr. 343-44).

Plaintiff's medication was changed to Celexa and Klonopin and he was referred for mental health treatment (Tr. 344).

On April 3, 2009, Dr. Frank Pennington reviewed Plaintiff's file and opined there was no significant change since the ALJ's decision in 2002 (Tr. 349-52). The same date, he filled out a physical residual functional capacity assessment ("PRFC") and opined Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk for about six hours in an eight hour day, sit for about six hours in an eight hour day, could only occasionally perform any postural changes, had visual limitations in far acuity, and was otherwise not limited (Tr. 367-75). Dr. Pennington noted Plaintiff's complaints appeared partially credible, but opined Dr. Mullady's assessment was overly restrictive based on the objective medical findings (Tr. 372-73).

On May 23, 2009, Plaintiff's sister helped him fill out another function report (Tr. 243-50). In this report, Plaintiff indicated he stayed in his room away from everyone, had no problem with personal care but needed to be reminded to bathe and take medication, could make sandwiches daily but could not use the stove due to shaking too much, might vacuum, would go outside maybe once a day to sit on the porch, shopped once a month for 20 to 30 minutes, played Nintendo games, talked to his family and attended church weekly, and could only walk for 30 steps before needing to rest for 35-45 minutes (Tr. 244-49).

Plaintiff returned to Southside Clinic on July 21, 2009 and complained of numbness in his arms and hands, back pain and frequent headaches; he had not followed up with his mental health treatment and MRIs were scheduled (Tr. 402-03). The MRI of Plaintiff's thighs on July 29, 2009 was normal and no evidence of focal nodule or mass was observed (Tr. 405, 431). An MRI of

9

Plaintiff's spine on August 4, 2009 showed mild spinal stenosis at the L3-L4 level and spondylolysis and grade I spondylolisthesis at the L5-S1 level (Tr. 404, 432-33). During his appointment at Southside Clinic on August 20, 2009, Plaintiff reported his legs were feeling numb and weak and he could not walk much; he was referred to orthopedics (Tr. 401-02). In March 2010, Plaintiff returned to Southside Clinic complaining of back pain and needed a refill on his medications; Plaintiff also had low levels of Depakote so the dose was increased (Tr. 399).

Views of Plaintiff's chest on April 29, 2010 showed chronic obstructive pulmonary disease ("COPD") but no acute cardiopulmonary disease (Tr. 430, 436).

### 2. Mental

Plaintiff presented to Fortwood Center for an intake appointment on December 15, 2008 (Tr. 307-13). Plaintiff stated he had bad nerves and found being around people or being around crowds very difficult; he reported feeling this way for 10-15 years following the death of his mother and stepdaughter and stated he felt he took on the problems of others and it was overwhelming (Tr. 307). Plaintiff reported a suicide attempt in 1996 and stated his physical problems included tumors on his arms and back and high cholesterol (Tr. 307). Plaintiff reported living with family and liked fishing, swimming and cookouts with less than nine people (Tr. 307). He had maintained steady employment until about a month before his appointment (Tr. 307). Plaintiff reported poor sleep of two hours a night and hallucinations and was diagnosed with generalized anxiety disorder and rule out psychotic disorder, not otherwise specified (Tr. 308). His Global Assessment of Functioning

("GAF") score was 45[2] (Tr. 308). Part of Plaintiff's treatment plan included seeking employment (Tr. 309-10). A Clinically Related Group ("CRG") form filled out on this date indicated Plaintiff had mild limitations in activities of daily living due to living with siblings and being unemployed, moderate limitations in interpersonal functioning due to dislike of crowds and an inability to keep a job, moderate limitations in concentration, performance and pace attributable to very poor concentration which caused him to lose his most recent job, and moderate limitations in adapting to change due to increased anxiety attributable to job loss and friends (Tr. 311-12). Plaintiff was designated in the group of individuals who were formerly severely impaired and needed services to prevent relapse (Tr. 313).

Plaintiff submitted to a psychological evaluation with Arthur Stair, MA on February 11, 2009 (Tr. 318-22). Plaintiff reported feeling stressed out, having difficulty adjusting to his back pain, staying sad and being less outgoing, crying a lot, staying in his room because he got nervous and jittery around people, and a lack of motivation since quitting his job; he preferred going to the woods to sit by himself and he avoided almost everyone (Tr. 318-19). Plaintiff stated he had completed the ninth grade before he dropped out and made average grades; he did not mention any learning difficulties (Tr. 319). Plaintiff reported smoking about four packs of cigarettes a day and had stopped drinking recently after a long history of heavy drinking; he reported only getting about an hour or two of sleep each night and sometimes napped (Tr. 320). Plaintiff stated his daily activities involved doing things in the yard and watching TV; he stayed inside a lot because he liked to be

---

[2] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication" or a "major impairment in several areas," a GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

11

alone, did not have other hobbies, and did not talk to many people (Tr. 320). On a good day, Plaintiff got to talk to his grandchildren; on a bad day, Plaintiff got irritated and mad easily (Tr. 320).

Mr. Stair observed Plaintiff appeared to be mildly to moderately agoraphobic and had mild-to-moderate anxiety, mild panic disorder symptoms, and mild depressed affect; Mr. Stair further observed it appeared that Plaintiff's depression used to be much worse than it was now, and it did not appear that Plaintiff had any personality disorder or symptoms of mania (Tr. 320). Mr. Stair opined Plaintiff would be able to work best in relatively solitary conditions (Tr. 320). Mr. Stair further opined Plaintiff appeared to be fully capable of understanding simple information and directions, would be able to put those to use in a work setting, and had adequate abilities to comprehend and implement multistep complex instructions; his ability to maintain persistence and concentration on tasks for a full workday was moderately impaired given his mild-to-moderate panic disorder with agoraphobia and mild depressive disorder; and his social relationships were moderately impaired due to withdrawal due to depressed mood and agoraphobia (Tr. 320). Mr. Stair diagnosed Plaintiff with panic disorder with agoraphobia, mild to moderate and depressive disorder not otherwise specified, mild, and estimated Plaintiff's GAF at 55 (Tr. 321). Mr. Stair's evaluation was countersigned by Dr. Charlton Stanley, a supervising psychologist (Tr. 321).

Plaintiff had a psychiatric assessment at Fortwood Center the same day and reported depression, bad nerves, and difficulty being around people or crowds (Tr. 337-39). Plaintiff was diagnosed with anxiety disorder, not otherwise specified, depressive disorder, not otherwise specified, and rule out bipolar disorder; his GAF was estimated at 55-60 and Prozac was prescribed (Tr. 339). A CRG form was filled out the same day which indicated Plaintiff had mild limitations

in activities of daily living, concentration, performance and pace, and adapting to change and moderate limitations in interpersonal functioning; Plaintiff's GAF was 55 (Tr. 327-32).

On March 2, 2009, Dr. Andrew Phay filled out a psychiatric review technique form (Tr. 353-66). Dr. Phay opined Plaintiff had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace and had had no episodes of decompensation (Tr. 363). In his mental residual functional capacity assessment ("MRFC") form, Dr. Phay more specifically opined Plaintiff was moderately limited in the following abilities: understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with others without being distracted by them, completing a normal workday and workweek without interruptions from psychological symptoms, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers and peers without distracting them (Tr. 376-77). Otherwise, Plaintiff was not significantly limited (Tr. 376-77). Dr. Phay further opined Plaintiff appeared able to remember locations and work like procedures and understand, remember and perform simple and low-level detailed tasks, sustain an ordinary work routine around others and make acceptable work-related decisions, appropriately respond to changes and hazards in the work place, and set and pursue realistic work goals (Tr. 378). Plaintiff would likely have some, but not substantial, difficulties in maintaining concentration, performing routine daily activities, completing a normal workweek with acceptable performance, and interacting appropriately with the general public, supervisors and peers (Tr. 378). On March 25, 2009, Dr. Andrew Phay opined Plaintiff's mental impairments were greater than those indicated in the prior ALJ decision of 2002 (Tr. 345-48).

13

Plaintiff began seeking mental health treatment through the Volunteer Behavioral Health Care System in August 2009 after a referral from the Southside Clinic (Tr. 417-22). At his intake session, Plaintiff reported depression, not associating with others, getting aggravated, having financial problems, poor sleep and appetite, anxiety and nervousness (Tr. 417). Plaintiff reported hearing voices and past suicide attempts, had a tendency to become angry easily, and frequently mentioned chronic pain issues (Tr. 417, 421). Plaintiff was diagnosed with anxiety disorder not otherwise specified and mood disorder not otherwise specified and his GAF was 55 (Tr. 420). At his next appointment on September 22, 2009, Plaintiff reported getting less agitated but was still having problems with nerves and sleep; his medications were changed and his GAF was 60 (Tr. 415-16). In October 2009, Plaintiff exhibited symptoms of mood lability and psychosis, was overwhelmed with anxiety and panic symptoms, and could not sleep; his GAF remained at 60 (Tr. 413-14). Plaintiff reported having problems getting Depakote due to cost on December 31, 2009 and his medication was changed to valproic acid; he reported hearing multiple voices (Tr. 411-12).

During his appointment on February 15, 2010, Plaintiff reported the voices had improved, as had his anxiety and depression, which were both at a two on a scale of one to 10. It was noted he had multiple lipomas over his body, including one on his spine, and planned to file for disability; on March 16, 2010, Plaintiff was called about his lab results and low Depakote levels and stated he was not taking Depakote because he had not filled his prescription (Tr. 409-10). On May 14, 2010, Plaintiff denied having hallucinations or delusions and had been irritable lately, but his depression was 5/10 and his GAF remained 60 (Tr. 407-08). A CRG form filled out on August 9, 2010 indicated Plaintiff had no problems with activities of daily living, mild limitations in interpersonal functioning although he was integrating into the community, no problems with concentration, task

performance and pace, and moderate limitations in adapting to change because it could increase his anxiety; Plaintiff remained in the group of persons with formerly severe mental illness and his GAF was 60 (Tr. 446-48). During Plaintiff's appointment this day, he reported his fatty tumors were pushing on his skin on his arms and thighs and his depression and anxiety were both 7/10, but he had recently seen his grandchildren which made him happy (Tr. 443-44).

The following records were submitted to the Appeals Council after the ALJ's decision.[3] On November 8, 2010, Plaintiff reported a recent arrest for child support, but was only in jail for five hours; he reported being angry all the time because of his worries and aggravation and was staying with his son every other weekend to calm down; his mood was 7/10 for depression (Tr. 441-42). During his appointment on February 1, 2011, Plaintiff reported the death of his father in December 2010 and his son had lost his home, but he was still going to Alabama to stay with family every other weekend, reported calling his daughter when he got stressed, and was sleeping six hours a night (Tr. 439-40). Plaintiff's anxiety was 2/10 and depression was 3/10 (Tr. 439). On March 30, 2011, Plaintiff was not sleeping as well and he thought he just worried a lot about his family members (Tr. 437-38).

## III.     ALJ'S FINDINGS

### A.       Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

---

[3] Evidence submitted to the Court after the close of administrative proceedings cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, as here, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993).

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**B.    ALJ's Application of the Sequential Evaluation Process**

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since August 1, 2008, the alleged onset date (Tr. 18). At step two, the ALJ found Plaintiff had the following severe impairments: degenerative disk disease of the lumbar spine and mood and anxiety disorders (Tr. 18). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 18). The ALJ specifically discussed his consideration of Listings 12.04 and 12.06 (Tr. 18-20). The ALJ determined Plaintiff had the RFC to perform light work, except he should have the opportunity to alternate sitting and

standing positions every 30 minutes, could perform only simple, routine, repetitive work, and should avoid work with the general public (Tr. 20). At step four, the ALJ found Plaintiff could not perform his past relevant work (Tr. 23). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 23-24). This finding led to the ALJ's determination that Plaintiff was not under a disability from August 1, 2008, the alleged onset date, through the date of the decision (Tr. 24-25).

## IV.    ANALYSIS

Plaintiff asserts three arguments. Plaintiff challenges the ALJ erred in determining Plaintiff's RFC for both his physical (exertional) limitations and his mental (non-exertional) limitations. Plaintiff also argues the ALJ did not adequately evaluate the credibility of his subjective complaints.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v.*

*Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B.      Mental RFC

Plaintiff first argues the ALJ erred because he did not include all the mental impairments he found Plaintiff to have in the RFC [Doc. 14-1 at PageID# 75]. Specifically, Plaintiff alleges the evidence shows he has moderate limitations in social functioning as it pertains to all groups, but the RFC determined by the ALJ only included social restrictions as to the general public [*id.*]. Plaintiff contends he should also have been restricted to limited interaction with supervisors and coworkers

based on information contained in the opinions of the file reviewer, to which the ALJ gave great weight, and information noted in the report of Mr. Stair and signed by Dr. Stanley, to which the ALJ also gave great weight [*id.* at PageID# 76]. Because the file reviewer indicated Plaintiff would have difficulties interacting with the public, supervisors and peers, and Mr. Stair's report indicated Plaintiff would work best in a relatively solitary condition, neither opinion distinguished between the groups of individuals and Plaintiff argues the ALJ erred in imposing a restriction only as to the general public [*id.* at PageID# 76-77]. Plaintiff contends the ability to respond appropriately to supervisors and coworkers is a basic requirement of unskilled work and the ALJ's failure to include these limitations in the RFC is not supported by substantial evidence [*id.* at PageID# 78-79]. Plaintiff further argues the ALJ similarly erred in failing to include limitations on Plaintiff's ability to maintain concentration, persistence and pace, an area in which Mr. Stair and Dr. Stanley opined he had moderate limitations and the file reviewer opined he would likely have some difficulty [*id.* at PageID# 79-80]. Plaintiff characterizes the ALJ's limitation to unskilled work as an improper assumption that his limitations would be accommodated by this type of work, when some unskilled jobs would in fact require high levels of concentration [*id.* at PageID# 80].

The Commissioner argues the record indicates Plaintiff had moderate GAF scores and the ALJ did not have to mirror the opinion of either Dr. Phay or Mr. Stair [Doc. 16 at PageID# 102-03]. The Commissioner contends Plaintiff's argument concerning moderate limitations in social functioning reflected on the psychiatric review technique ("PRT") form is unfounded because the findings from the PRT do not translate into the RFC and do not need to be included in a hypothetical question to the VE [*id.* at PageID# 104].

The ALJ found the record did not reflect disabling mental health symptoms, but that there

had been some decline from the prior ALJ decision, and he further determined "[t]he claimant credibly should avoid working with the general public, but he has not persuasively demonstrated that any mental impairment prevents him from meeting the demands of unskilled work that avoids the general public" (Tr. 23). The ALJ stated he gave great weight to the "opinions of reviewing physicians and mental health sources for the State agency, especially regarding the finding[] that current evidence shows greater mental restriction than found in the prior Administrate Law Judge decision. . ." and further noted he gave great weight to the opinion of Mr. Stair, "who identified moderate limitations consistent with unskilled work not involving the general public" (Tr. 23). It appears from these statements, therefore, that the ALJ did not explicitly adopt the entirety of the restrictions opined by Dr. Phay or Mr. Stair.

In the prior decision, the ALJ had essentially imposed no non-exertional limitations, simply limiting Plaintiff to light work and determining he could perform his past relevant work (Tr. 71-73). The ALJ in the instant decision imposed more non-exertional limitations by limiting Plaintiff to simple, routine repetitive work and no work with the general public, and I **FIND** substantial evidence supports the ALJ's determination as to Plaintiff's mental RFC.

Although Plaintiff argues the ALJ incorrectly found Plaintiff was not fully compliant with his mental health medications, in March 2010 when Plaintiff's Depakote levels were low, he did tell his mental health providers he was not taking Depakote because he had not filled his prescription (Tr. 410). Plaintiff later claimed in May 2010 that he had taken his medication appropriately, but that was inconsistent with what he stated in March (Tr. 407). I therefore **FIND** no error with the ALJ's statement as to medication compliance.

The record otherwise reflects mild to moderate GAF scores and mild to moderate restrictions

in various areas. It is true that Mr. Stair opined Plaintiff would work best in "relatively" solitary conditions, and that Dr. Phay opined Plaintiff was likely to have some, but not substantial, difficulties in interacting with supervisors and peers in addition to the public; however, the ALJ need not have incorporated all of these opinions in his RFC and, from the language used, it appears he did not fully adopt any opinion (Tr. 377-78). Moreover, although these opinions did provide some evidence that Plaintiff *might* be somewhat restricted in his ability to work well with coworkers and supervisors, there was other evidence in the record indicating Plaintiff had mild social limitations, including multiple reports of spending time with family and treatment records indicating Plaintiff's interpersonal functioning had improved.

In support of his argument that the ALJ's failed to properly address Plaintiff's difficulties in working with supervisors, Plaintiff cites to a case from the United States Court of Appeals for the Seventh Circuit, *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004). In *Young*, the court found fault with the ALJ's failure to include restrictions with interacting with supervisors in the RFC because "there was substantial evidence within the record that Young has difficulty accepting instruction, responding appropriately to criticism, and interacting with others on the job." *Id.* at 1002. The Sixth Circuit has previously ratified treating categories of individuals – the public, coworkers, and supervisors – differently depending on the circumstances. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 280-81 (6th Cir. 2009) (limitations as to public and coworkers, but not supervisors); *see also Minor v. Comm'r of Soc. Sec.*, 12-1268, 2013 WL 264348, at *13 (6th Cir. Jan. 24, 2013) (the ALJ determined in the RFC that claimant could interact with supervisors and coworkers, but could have only occasional contact with the general public); *Ledford v. Astrue*, 311 F. App'x 746, 754 (6th Cir. 2008) (limitations as to public and, to the extent possible, coworkers). In the Sixth Circuit (and

presumably the Seventh Circuit as well), each case must be reviewed individually. As noted above, there is not substantial evidence in the record in this case that Plaintiff has significant difficulties interacting with coworkers and supervisors. In fact, from Plaintiff's testimony it appears he interacted well with coworkers at previous jobs and only had conflict with supervisors when they wanted him to complete a task he felt he could not perform due to physical complaints (Tr. 42, 45-46). Plaintiff described no difficulties with coworkers or supervisors on the basis of his mental health conditions.

Although Plaintiff also takes issue with the lack of a restriction as to concentration, persistence or pace, the RFC limiting Plaintiff to simple, routine, repetitive work appears to reflect Dr. Phay's assessment that Plaintiff was likely to have some, but not substantial, difficulty in maintaining concentration and performing routine daily activities and making simple work-related decisions, as well as Mr. Stair's opinion that Plaintiff would be moderately impaired in maintaining persistence and concentration, but was fully capable of understanding and executing simple instructions (Tr. 320, 378). Although there may also be evidence to suggest more limitations than those incorporated in the RFC, there is substantial evidence to support those which the ALJ included. As such, after weighing the evidence in the record, I **CONCLUDE** that substantial evidence supports the ALJ's determination as to Plaintiff's non-exertional limitations.

### C.    Physical RFC

Plaintiff next argues the ALJ's determination of his physical limitations is similarly flawed because the ALJ failed to include postural limitations in the RFC, as contained in the opinion of the file reviewer to which the ALJ gave great weight [Doc. 14-1 at PageID# 81]. Plaintiff further argues the ALJ did not adequately explain the weight afforded to the opinions of Dr. Mullady and Dr.

Pinga, which both indicated additional physical restrictions not incorporated into the RFC, and did not resolve the conflicts resulting from giving great or considerable weight to various conflicting opinions [*id.* at PageID# 82-83]. Finally, Plaintiff argues the ALJ's finding that Plaintiff can perform light work is inconsistent with the need to alternate sitting and standing every 30 minutes, because most light work jobs require a good deal of standing and few can be performed in a seated position [*id.* at PageID# 83].

The Commissioner argues the RFC does not need to mirror the opinion of any one examining or reviewing physician, but the ALJ must consider all the evidence in reaching his RFC and here, the ALJ addressed each of the opinions in the record [Doc. 16 at PageID# 100-01]. The Commissioner argues the ALJ's finding that Plaintiff could perform light work was not inconsistent with the added restriction to alternate sitting and standing, as the VE testified specifically as to jobs Plaintiff could perform with that restriction [*id.* at PageID# 101].

The ALJ found that Plaintiff's physical RFC had not changed significantly from the prior ALJ decision except that he should have the opportunity to change positions every 30 minutes (Tr. 23). The ALJ further stated as follows:

> As for the opinion evidence, no treating source offered an opinion regarding the nature and limiting effects of the claimant's impairments. I give great weight to the opinions of reviewing physicians and mental health sources for the State agency, especially regarding the findings that current evidence shows . . . no significant change in exertional restrictions. I give considerable weight to the opinions of consultative examiners Drs. Pinga and Mullady, who restricted the claimant to a reduced range of light and to sedentary exertional activity respectively. However, I agree with the State agency physicians that Dr. Mullady failed to explain how the claimant's minimal objective findings support a restriction to sedentary exertional activity. I note that the impartial vocational expert at the hearing identified jobs for an individual with the claimant's vocational and age factors and a residual functional

23

capacity for sedentary work.

(Tr. 23). This case presents the rather unfortunate situation where a claimant has no treating physician opinion about limitations; instead, the available opinions are those of two physicians who examined Plaintiff one time (one in 2006, one in 2009) and a state agency consultant who reviewed Plaintiff's file. Pursuant to 20 C.F.R. § 404.1527, the ALJ had to consider all of these opinions and specify the weight afforded to them, but was not bound by the findings in any one opinion.

While the ALJ could have explained in more detail his conclusions as to the treatment of the opinions of Drs. Pinga and Mullady, there is no requirement the ALJ give good reasons for the weight afforded to the opinions of examining or consulting physicians who do not qualify as treating physicians. As it stands, it appears the ALJ reviewed the examinations of Drs. Pinga and Dr. Mullady and the file review by Dr. Pennington and determined all the opinions were worthy of some weight, perhaps due to the consistency in each opinion with respect to Plaintiff's ability to lift and/or carry and sit. As to Plaintiff's ability to stand and/or walk, the ALJ found the opinions of Dr. Pinga and Dr. Pennington to be more supported by the evidence than the opinion of Dr. Mullady. The ALJ specifically noted that he agreed with Dr. Pennington's opinion that Dr. Mullady's opinion (limiting Plaintiff to standing and/or walking at least two hours in an eight hour day) was more restrictive than warranted by his objective findings on examination. I **FIND** the ALJ properly assigned weight to each opinion in the record and **CONCLUDE** his decision as to Plaintiff's ability to stand and/or walk (and resulting conclusion that Plaintiff could perform light work) was supported by substantial evidence.

As for Plaintiff's argument regarding the ALJ's inclusion of a faulty sit/stand option, the ALJ noted in his decision that the VE identified jobs at the hearing which could be performed in a

24

sedentary manner. The VE also specifically testified that based on experience, the jobs identified could accommodate a sit/stand option every 30 minutes, although the DOT did not explicitly list a sit/stand option in any job description. With respect to Plaintiff's other argument about the ALJ's failure to include postural restrictions, it does not appear the ALJ adopted the portion of Dr. Pennington's opinion indicating that Plaintiff should perform postural movements only occasionally, but these restrictions might be encompassed in the VE's identification of jobs Plaintiff could perform in a sedentary manner. *See* 20 C.F.R. § 404.1567; 20 C.F.R. § 416.967(a). Moreover, as noted above, it does not appear the ALJ fully adopted any of the opinions of record, instead determining that they were all worthy of "great" or "considerable" weight but none were worthy of controlling weight. The ALJ's starting point (and that of file reviewing consultant Dr. Pennington) was at the prior ALJ's decision; thus, although the ALJ was reviewing new evidence in the record, he was reviewing it with an eye towards any changes in Plaintiff's condition from the time of that decision. *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997) ("When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."). I **FIND** the ALJ did not err in failing to include postural limitations in his RFC and further **FIND** the sit/stand option was adequately addressed by the hypothetical question to the VE and the VE's testimony as to the availability of a sit/stand option for the jobs he identified. As such, and after reviewing all Plaintiff's arguments on this issue, I **CONCLUDE** the ALJ's determination as to Plaintiff's remaining physical capabilities was supported by substantial evidence.

### D. Credibility Determination

Finally, Plaintiff argues the ALJ erred in determining his subjective complaints were not

fully credible. Plaintiff contends the ALJ was wrong in stating that Plaintiff was not compliant with his medication and did not follow up with recommended treatment because the record does not support these statements [Doc. 14-1 at PageID# 83-84]. Plaintiff argues he had no insurance and this was a valid basis for his limited treatment [*id.* at PageID# 85]. As to the ALJ's comments about Plaintiff's testimony that he was on a waiting list to be evaluated for scoliosis, which did not appear in the record, Plaintiff argues it was possibly a referral to evaluate Plaintiff for spondylolisthesis and Plaintiff simply got the two conditions confused [*id.* at PageID# 86]. Plaintiff further argues the ALJ improperly emphasized his daily activities to detract from his credibility, when none of his daily activities are inconsistent with Plaintiff's pain [*id.* at PageID# 86-87]. Finally, Plaintiff argues the ALJ erred by improperly minimizing Plaintiff's back pain and the pain caused by his fatty tumors [*id.* at PageID# 87-88].

The Commissioner argues the ALJ's credibility determination was supported by substantial evidence because Plaintiff failed to provide objective evidence to substantiate his subjective complaints [Doc. 16 at PageID# 105]. The Commissioner contends the record showed no more than moderate degenerative disc disease, no evidence Plaintiff ever had his orthopedic consultation, and no complaints to his doctors concerning pain due to his fatty tumors [*id.* at PageID# 105-06]. The Commissioner asserts Plaintiff similarly failed to explain how his fatty tumors caused pain during the hearing before the ALJ, but did testify to working with the tumors for many years [*id.* at PageID#: 106]. The Commissioner further argues the record showed Plaintiff was noncompliant with his pain medication,[4] which undermined his complaints, and his activities were inconsistent

---

[4] Although the Commissioner asserts Plaintiff was noncompliant with his pain medication, it appears from the record (and the citations to the record provided in support of this statement) that Plaintiff's only noncompliance was with Depakote for Plaintiff's mental health conditions.

with his complaints of pain [*id.* at PageID#: 106-07].

Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (ALJ's credibility assessment is entitled to substantial deference).

The ALJ stated as follows with respect to Plaintiff's credibility:

> The claimant's credibility is diminished primarily by the discrepancy between his allegations of severe pain and the objective findings and diagnostic imaging of no greater than moderate degenerative disk disease. The claimant testified to severe pain from his fatty tumors as well, which the medical literature indicates is a relatively rare symptom, but he did not report such severe pain to treating sources. The claimant's credibility is also diminished by some discrepancies in his reported level of activities. For example, the claimant related spending five to six hours per day outside and walking up to one half mile between relatives' houses, mainly when he was just spending nights with one sister or another. He indicated difficulty lifting over 50 pounds. This account varies greatly from the claimant's hearing testimony that he can lift a two-pound bag of sugar and only walk a little further than the length of the hearing room. The absence of any muscle weakness or sensory deficit strongly contradicts a severity of back impairment that would reasonably cause the degree of limitation the claimant alleged at the hearing.

27

> I have considered the claimant's subjective complaints. . . . The claimant sought treatment for back and leg pain, but his medical workup revealed mild to moderate degenerative disk disease on diagnostic imaging and minimal clinical signs of significant spinal dysfunction. Treating sources did not indicate the claimant was experiencing high levels of pain or significant functional limitations and there are only a few references to treatment with the painkiller Darvocet, some nonsteroidal ani-inflammatory medication, and a muscle relaxer. The claimant gave only broad descriptions of the nature of his pain and identified no clear aggravating or ameliorating factors. The claimant complained of his lipoma worsening and being painful to the touch in May 2009, but given his minimal complaint to treating sources and his failure to follow up with recommended treatment, I do not find this condition to be a credible basis for disabling pain.

(Tr. 22-23).

I **FIND** the ALJ properly addressed Plaintiff's subjective complaints and **CONCLUDE** his determination that Plaintiff's subjective complaints were not fully credible was supported by substantial evidence. I have already found the ALJ did not improperly determine that Plaintiff was noncompliant with his mental health medication. The ALJ further pointed out that Plaintiff's complaints were at odds with the objective evidence in the record, which reflected no more than moderate degenerative disc disease, and were similarly at odds with some of the inconsistent statements Plaintiff made about his abilities. Plaintiff's initial function report reflected a fairly high level of physical functioning even with all his impairments, as Plaintiff stated he could lift up to 50 pounds and walk half a mile at a time and possibly up to a mile between his sisters' homes. On his second function report, Plaintiff indicated more severe problems with his ability to walk but stated he could vacuum, and there were inconsistencies with Plaintiff's prior statements about personal care and daily activities. Plaintiff's testimony at the hearing, however, reflected claims of severe pain from both his back and fatty tumors, an inability to walk even a short distance, an inability to

undertake most physical or daily activities, frequent need for rest, and the ability to lift no more than two pounds (and, at one point, he stated he could not lift more than two ounces). I **FIND** the ALJ reasonably concluded that Plaintiff's reports of his daily activities were inconsistent and detracted from his credibility when compared to the objective evidence in the record.

At the hearing, Plaintiff also testified to new, severe symptoms never previously mentioned to his physicians, such as a fatty tumor moving from side to side in his stomach and making him throw up. As for his other statements about the fatty tumors during the hearing, Plaintiff was not very specific about how the tumors caused such severe pain even after repeated questioning by the ALJ. Moreover, it was accurate for the ALJ to state that Plaintiff never reported severe pain from the fatty tumors to his physicians; although he told Dr. Pinga they hurt in extreme cold weather and later told a physician they were painful to the touch, he did not report any severe, constant, disabling pain caused by the tumors, and there is no indication Plaintiff was in any extreme pain from any of his conditions during examination by his treating physicians.

Plaintiff argues the ALJ improperly relied on his failure to seek treatment when he has no insurance. However, this was only one factor the ALJ considered in making his determination. Furthermore, the evidence shows Plaintiff received various referrals for MRIs and other diagnostic testing that presumably also took place while he was uninsured, and it is unclear why Plaintiff was able to follow through with some referrals and not others.

Plaintiff also finds fault with the ALJ for comments about Plaintiff's testimony regarding scoliosis. It appears Plaintiff is actually taking issue with the ALJ's probing during the hearing, as the ALJ simply stated in the decision that "[t]he claimant testified to a six-month wait for evaluation of scoliosis, but this is also not documented in the record" (Tr. 21). I **FIND** no error in this

statement, as it is factually accurate in all respects. Although Plaintiff now claims he likely got scoliosis and spondylolisthesis mixed up and the orthopedic referral was for the latter condition, he testified consistently at the hearing that the evaluation was for scoliosis, and Plaintiff's attorney did not intervene to correct any of these statements at the time. The ALJ did note in his decision that Plaintiff received a referral for an orthopedic consultation in August 2009, but that the consultation had not taken place (Tr. 21). The ALJ questioned Plaintiff in greater depth about this referral during the hearing, but contrary to Plaintiff's argument, it does not appear this statement regarding possible scoliosis was one of the reasons the ALJ relied upon in making his credibility determination. This was the only mention of Plaintiff's testimony in that regard in the ALJ's decision, and it does not appear in the passage reproduced above which centers on credibility. Instead, it appears in a summary of Plaintiff's medical records. As such, I **FIND** no error with the issues raised by Plaintiff as to credibility and I **CONCLUDE** the ALJ's determination that Plaintiff's subjective complaints were not fully credible was supported by substantial evidence.

Accordingly, and after considering all of Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I

**RECOMMEND** that:[5]

    (1)      Plaintiff's motion for summary judgment [Doc. 14] be **DENIED**.

    (2)      The Commissioner's motion for summary judgment [Doc. 15] be **GRANTED**.

    (3)      The Commissioner's decision denying benefits be **AFFIRMED**.

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).